# EXHIBIT A

**DRAFT**

| | |
|---|---|
| | Formatted: Font: Bold |

Gregory J. Bevelock
Charles M. Fisher
BEVELOCK & FISHER LLC
14 Main Street, Suite 200
Madison, NJ 07940
(973) 845-2999
gbevelock@bevelocklaw.com
cfisher@bevelocklaw.com
*Attorneys for Plaintiffs,*
*Rabbi Philip Lefkowitz, Levi Lefkowitz,*
*and Moshe Lefkowitz*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| RABBI PHILIP LEFKOWITZ; LEVI LEFKOWITZ; and MOSHE LEFKOWITZ, <br><br> Plaintiffs, <br><br> v. <br><br> WESTLAKE MASTER ASSOCIATION, INC.; and BOBBIE RIVERE, DENNIS LAFER, RICHARD E. FONTANA, MARIE MILLER, JAMES P. GARRETT, DAVID J. WHELAN, MICHAEL W. YUDKIN, DIANE E. O'CONNOR, and PETER J. MARTINASCO, Individually and as Members of the Board of Trustees of the Westlake Master Association, Inc., <br><br> Defendants. | CIVIL ACTION NO. 18-14862 (AET)(TJB) <br><br> **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs, RABBI PHILIP LEFKOWITZ, LEVI LEFKOWITZ, and MOSHE LEFKOWITZ (collectively, "Plaintiffs" or the "Lefkowitzes"), all of whose residence is at 27 Crooked Stick Road, Jackson, New Jersey 08527, for their First Amended Complaint against defendants, WESTLAKE MASTER ASSOCIATION, INC. (the "Association"), which has a principal place of business located at 1 Pine Lake Circle, Jackson, New Jersey 08527, and BOBBIE

<u>**DRAFT**</u>

RIVERE (who resides at 10 Pine Valley Road, Jackson, New Jersey), DENNIS LAFER (who resides at 11 Shoal Road, Jackson, New Jersey), RICHARD E. FONTANA (who resides at 114 Wild Dunes Way, Jackson, New Jersey), MARIE MILLER (who resides at 15 Congressional Road, Jackson, New Jersey), JAMES P. GARRETT (who resides at 10 Oakmont Lane, Jackson, New Jersey), DAVID J. WHELAN (who resides at 1 Pine Valley Road, Jackson, New Jersey), MICHAEL W. YUDKIN (who resides at 34 Inverness Lane, Jackson, New Jersey), DIANE E. O'CONNOR (who resides at 34 Muirfield Road, Jackson, New Jersey), and PETER J. MARTINASCO (who resides at 58 Crooked Stick Road, Jackson, New Jersey), individually and as members of the Board of Trustees of the Westlake Master Association, Inc. (collectively, the "Board" or the "Board Members") (the Association and the Board / Board Members are collectively referred to as "Defendants"), hereby state as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action arises out of Defendants' refusal to comply with their obligations under the Fair Housing Act ("FHA"), 42 <u>U.S.C.</u> §3601 <u>et seq.</u>, and the New Jersey Law Against Discrimination ("NJLAD"), <u>N.J.S.A.</u> 10:5-1 <u>et seq.</u>, as well as under the governing documents of the planned real estate development in which the Lefkowitzes live and that the Defendants govern. Defendants are obligated by law to reasonably accommodate the Lefkowitzes' physical handicaps <u>and religion or creed</u> and are barred from discriminating against them based on their handicaps or religion.

2.      Rabbi Lefkowitz and his two sons, Levi and Moshe, are Orthodox Jews. All three of the Lefkowitzes suffer from diabetes and have lost limbs. Levi is also legally blind. Defendants have denied the Lefkowitzes' requests to (a) construct a screened porch that is permitted under the Association's governing documents that could also be used as a permanent sukkah, even though

2

**DRAFT**

the sukkah permitted by the Association's rules is far too small to accommodate the Lefkowitzes' wheelchairs; and (b) to open an existing gate to the adjacent neighborhood where Rabbi Lefkowitz's daughter lives and where the Lefkowitzes attend a prayer meeting and install a path over which the Lefkowitzes could travel in their wheelchairs.

3.     There is no valid basis for Defendants' denial of these reasonable requests that are all necessary to afford the Lefkowitzes equal opportunity to fully use and enjoy their home and are necessary for the Lefkowitzes' full enjoyment of their home.

4.     The Lefkowitzes bring this action to enforce their rights under the FHA, NJLAD and the governing documents of the Association, as well as to obtain the accommodations to which they are entitled.

<strong>PARTIES</strong>

5.     Plaintiff, Rabbi Philip Lefkowitz, resides at 27 Crooked Stick Road, Jackson, New Jersey.

6.     Plaintiff, Levi Lefkowitz, resides at 27 Crooked Stick Road, Jackson, New Jersey. Levi is Rabbi Lefkowitz's son.

7.     Plaintiff, Moshe Lefkowitz's permanent residence is located at 27 Crooked Stick Road, Jackson, New Jersey.  Moshe is temporarily residing the Leisure Chateau Care and Rehabilitation Center, which is located in Lakewood, New Jersey.  Moshe also is Rabbi Lefkowitz's son.

8.     The Lefkowitzes home is located in the Westlake Golf and Country Club ("Westlake"), which is a 55 year and over age restricted, planned real estate development located in Jackson, New Jersey.

3

**DRAFT**

9.      Upon information and belief, defendant, Westlake Master Association, Inc., is a New Jersey non-profit corporation established for the purposes, among others, of administering and maintaining the common property and facilities of the development pursuant to the governing documents of the Association and the New Jersey Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-21 et seq. (the "PREDFDA").

10.      Upon information and belief, defendant, Bobbie Rivere, resides in Westlake at 10 Pine Valley Road, Jackson, New Jersey, and is the president and a member of the Board of Trustees of the Westlake Master Association, Inc.

11.      Upon information and belief, defendant, Dennis Lafer, resides in Westlake at 11 Shoal Road, Jackson, New Jersey, and is the vice president and a member of the Board of Trustees of the Westlake Master Association, Inc.

12.      Upon information and belief, defendant, Richard E. Fontana, resides in Westlake at 114 Wild Dunes Way, Jackson, New Jersey, and is the treasurer and a member of the Board of Trustees of the Westlake Master Association, Inc.

13.      Upon information and belief, defendant, Marie Miller, resides in Westlake at 15 Congressional Road, Jackson, New Jersey, and is the secretary and a member of the Board of Trustees of the Westlake Master Association, Inc.

14.      Upon information and belief, defendant, James P. Garrett, resides in Westlake at 10 Oakmont Lane, Jackson, New Jersey, and is member of the Board of Trustees of the Westlake Master Association, Inc.

15.      Upon information and belief, defendant, David J. Whelan, resides in Westlake at 1 Pine Valley Road, Jackson, New Jersey, and is member of the Board of Trustees of the Westlake Master Association, Inc.

4

**DRAFT**

16.     Upon information and belief, defendant, Michael W. Yudkin, resides in Westlake at 34 Inverness Lane, Jackson, New Jersey, and is member of the Board of Trustees of the Westlake Master Association, Inc.

17.     Upon information and belief, defendant, Diane E. O'Connor, resides in Westlake at 34 Muirfield Road, Jackson, New Jersey, and is member of the Board of Trustees of the Westlake Master Association, Inc.

18.     Upon information and belief, defendant, Peter J. Martinasco, resides in Westlake at 58 Crooked Stick Road, Jackson, New Jersey, and is member of the Board of Trustees of the Westlake Master Association, Inc.

19.     Upon information and belief, the Board Members are responsible for managing the property, affairs, and business of the Association in accordance with the Association's governing documents and law.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 & 1343(a)(3) & (4) as Plaintiffs assert claims under the FHA, 42 U.S.C. §§ 3604, 3613 & 3617. The Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

21.     Venue in this judicial district is proper pursuant to 28 U.S.C. §1391.

## FACTS COMMON TO ALL COUNTS

**The Lefkowitzes' Jewish Faith and Handicaps**

22.     Born in Brooklyn, Rabbi Lefkowitz served in the rabbinate for fifty years, holding positions in the United States, Canada, and the United Kingdom.

**DRAFT**

23.     While in the United Kingdom, Rabbi Lefkowitz held the post of senior minister to the Whitefield Hebrew Congregation of Manchester, one of the most significant Jewish congregations in the English provinces.

24.     Prior to moving to New Jersey in July 2016, Rabbi Lefkowitz and his sons Levi and Moshe, lived in Chicago for nearly 30 years.

25.     In Chicago, Rabbi Lefkowitz served as assistant executive director of the Chicago Rabbinical Council, in which capacity he represented the Orthodox rabbinate before government agencies as well as the community at large.

26.     For nearly two decades, Rabbi Lefkowitz served Agudas Achim North Shore Congregation, one of Chicago's oldest and most significant synagogues.

27.     Rabbi Lefkowitz is the recipient of the City of Chicago's 1993 Human Relations Award, which was presented to him by Mayor Richard Daley, for his work in enhancing understanding and respect between African American and Orthodox Jewish teens.

28.     Levi and Moshe, like their father, are also Orthodox Jews, and faithfully observe the obligations of their faith to the best of their abilities.

29.     All three Lefkowitzes suffer from diabetes and, as a result thereof, have lost portions of their legs.

30.     The Lefkowitzes all use wheelchairs to transport themselves.

**The Lefkowitzes Move to Jackson**

31.     After retiring from the rabbinate, Rabbi Lefkowitz, along with his sons Levi and Moshe, moved to Jackson, New Jersey to be close to his daughter, her husband and their then-six children.

**DRAFT**

32.    Rabbi Lefkowitz purchased 27 Crooked Stick Road because it is located a few blocks from his daughter's home on Gale Chambers Road, although his daughter's home is not part of Westlake.

33.    Upon information and belief, the Lefkowitzes are the first and presently only Orthodox Jewish family to live in Westlake.

34.    However, Orthodox families are moving into homes on Gale Chambers Road.

**Rabbi Lefkowitz's Attempts to Construct a Sukkah**

35.    The construction of a sukkah is a religious commandment found in the Hebrew Scriptures: "Now, the fifteenth day of the seventh month, when you have gathered in the produce of the land, you shall keep the festival of the LORD, lasting seven days. . . .  You shall live in booths for seven days; all that are citizens in Israel shall live in booths, so that your generations may know that I made the people of Israel live in booths when I brought them out of the land of Egypt: I am the LORD your God." Leviticus 23:39-43.

36.    Sukkah is a Hebrew word meaning "booth."

37.    Sukkot is the name of the annual festival Jews are required to celebrate pursuant to Leviticus 23:39-43.

38.    Sukkot is a festival of giving thanks for the fall harvest and commemorates the forty years of Jewish wandering in the desert after the giving of the Torah atop Mount Sinai.  Orthodox Jews, who take the commandment to dwell in booths literally, are required to erect a sukkah.  The sukkah is used during the seven-day festival for eating, entertaining and even for sleeping.

39.    In 2016, Sukkot began on October 17, 2016.

40.    In preparation for Sukkot, the Lefkowitzes hired workers to build a sukkah.

**DRAFT**

41.     On October 13, 2016, Rabbi Leftkowitz emailed Mr. Steven B. Hodges, the property manager for Westlake, and advised him that the Lefkowitzes were constructing the sukkah.

42.     On the same day, Mr. Hodges replied to Rabbi Lefkowitz. Mr. Hodges advised that the Association's rules, specifically Title III Section 8-32, permitted temporary sukkahs of certain dimensions and that there was a process that was required to be followed to obtain approval to build the temporary sukkah.

43.     Rabbi Lefkowitz had not been provided with a copy of Westlake's rules and regulations at the time he purchased the house in June 2016.

44.     Among numerous other criteria, the rules restricted the size of any sukkah to no bigger than 8 feet wide, 10 feet long, and 8 feet high.

45.     The rules also require the homeowner seeking to construct a sukkah to submit an application and plans for the sukkah and provide a bond.

46.     Rabbi Lefkowitz immediately submitted a hand-drawn plan of a proposed sukkah.

47.     The requested sukkah was larger than the permitted temporary structure because the Lefkowitzes all use wheelchairs and the 8 foot by 10 foot permitted sukkah is too small to accommodate three wheelchairs and a table, not to mention other family members.

48.     At the time that Rabbi Lefkowitz purchased his home in Westlake, Defendants knew that he and his son Moshe were amputees. Levi lost his leg later.

49.     Mr. Hodges rejected the plan because the sukkah was larger than that permitted by Westlake's rules.

50.     Rabbi Leftkowitz was thus unable to fulfill his religious obligation in 2016.

8

**DRAFT**

51.     During the following year, Rabbi Lefkowitz attempted to work with Defendants to obtain an accommodation concerning a sukkah.

52.     In the spring of 2017, the Association was conducting a review of its rules and regulations.  Taking that opportunity, Rabbi Lefkowitz wrote to the Board and requested that they reconsider their rules concerning sukkahs, which prevent Rabbi Lefkowitz from satisfying his religious obligations.  Rabbi Lefkowitz stated that, given his and his sons' handicaps, they should be permitted to construct a screened porch on his existing patio that would also serve as a permanent sukkah.  The structure would blend perfectly with the house and *would not be visible to anyone* except perhaps one neighbor, but only if they peered over their six-foot hedges.  In the words of Rabbi Lefkowitz, it would be an "unobtrusive structure."

53.     Rabbi Lefkowitz also noted that the Association's rules permit Christmas and Hanukkah decorations to be placed on the front exterior of their homes.  Unlike Rabbi Lefkowitz's proposed sukkah, the Christmas and Hanukkah decorations are visible to all passersby and need not blend in with the color or nature of the façade.

54.     Displaying Christmas and Hanukkah lights is not a religious obligation, unlike the construction of a sukkah.

55.     In an April 17, 2017 letter, defendant Bobbie Rivere, the Board's President, responded.  She stated that "[b]ecause the community consists of small individual lots containing homes in close proximity to one another, there are limitations on size, and permanent structures are not permitted."  She also stated that "community association living" involves a "balancing of interests and compromises are required for the greater good."  Responding to Rabbi Lefkowitz's use of the word "unobtrusive," Ms. Rivere further wrote:

> One resident's view of "obtrusive" may not comport with that of
> another resident.  Some individuals may object to the presence of

**DRAFT**

> Sukkahs and others may be unhappy with Christmas decorations. In common interest communities, those interests need to be reconciled to the extent possible.

56.   Ms. Rivere's statement that "permanent structures are not permitted" is false.

57.   Screened porches are expressly permitted by the Association's Rules.

58.   Moreover, Rabbi Lefkowitz was not objecting to the visible presence of Christmas and Hanukkah lights in the community. He was objecting to Defendants' refusal to permit him to construct a screened porch / sukkah of a size that he and his wheelchair bound sons could actually use and that would be entirely *invisible* to all other members of the Westlake community.

59.   Defendants refused to address any of the specific issues raised by Rabbi Lefkowitz and did not engage in a good faith dialogue concerning Rabbi Lefkowitz's request for an accommodation.

60.   On May 2, 2017, Rabbi Lefkowitz responded to Ms. Rivere and noted that she failed to address his request to build a screened porch that could also be used as sukkah, thereby resolving the sukkah-accommodation issue.

61.   Rabbi Lefkowitz also stated that Ms. Rivere's apparent belief that some resident's objections to the mere presence of a sukkah must be taken into consideration when formulating the Association's rules is nothing more than religious bigotry.

62.   Ms. Rivere did not respond to Rabbi Lefkowitz's May 2, 2017 letter until September 19, 2017.

63.   In her September 19, 2017 letter, Ms. Rivere stated:

> In response to your last communication, you raised the suggestion of building a screened porch. The Board has reviewed your request. While there are screened porches in the community, according to Title III of the Rules & Regulations *(See attached)*, the model of your home does not qualify. In order to qualify, and to add a screened porch after the fact, it must be the appropriate model of

10

**DRAFT**

> home and be an option originally offered by the developer.  Based
> on the information above and in my previous letter, the Board's
> position remains unchanged.

64.     Continuing Defendants' refusal to address Rabbi Lefkowitz's request for an

accommodation, Ms. Rivere attached to her letter a copy of the Association's rule regarding

temporary sukkahs and the application to erect a sukkah in accordance therewith, notwithstanding

that Rabbi Lefkowitz had already informed the Ms. Rivere and the Board that the size sukkah

permitted by the Association's rules was not large enough to accommodate the Lefkowitzes.

65.     Contrary to the statement in Ms. Rivere's September 19, 2017 letter, the rule she

cited does allow Rabbi Lefkowitz to build a screened porch.

66.     The rule referred to by Ms. Rivere is Title III, Rule 2-2.10, which states that

"[s]creened porches … can be added only to home models in which a *patio* was originally offered

by the developers" (emphasis added).

67.     Rabbi Lefkowitz's house has a patio, which obviously was originally offered by

the developers because it exists.  See Title III, Rule 2-2.11 ("Patios … of the types offered by the

developers are the *only* types permitted") (emphasis added).

68.     Ms. Rivere's assertion that Rabbi Lefkowitz's model house does not qualify for a

screened porch is false.

69.     On September 27, 2017, Rabbi Lefkowitz responded to the Board by email c/o Mr.

Hodges.  Rabbi Lefkowitz wrote in part:

> I am attempting to be a good neighbor and work with everyone.…
> Bottom line, my sons and I are all physically challenged and use
> wheelchairs and walkers. The limited size etc. allowed for a Sukkah
> in the by-laws precludes our ability to utilize it.
>
> When I met with members of the Architecture Committee to explore
> my volunteering to serve, I was told they make every effort to

11

**DRAFT**

cooperate with the homeowner.  That is all I am asking of the Trustees.

I expect the common decency of allowing me to practice my religion recognizing that we are a physically challenged family.  I don't believe this is too much to ask from my neighbors especially so as I am observing my faith in a modest manner on my own property.

I don't wish to see this situation go beyond neighbors.  All I'm asking is a little understanding and neighborly cooperation.

70.   Defendants did not respond to Rabbi Lefkowitz's email.

71.   Thereafter, Rabbis serving Reform, Conservative and Traditional congregations sent a joint letter to the Board in support of Rabbi Lefkowitz's request to construct a sukkah (the "Rabbi's Joint Letter").  The Rabbis wrote, in part:

We understand that, as a result of the rabbi's and his sons' physical challenges, they cannot build a sukkah on their rear patio in accord with the exact rules spelled out in your by-laws.  They require the sukkah to be larger with more illumination than permitted in your by-laws to allow them, given their respective poor eye sight and use of wheelchairs, to fulfill the Biblical requirement of Judaism described in Leviticus....

In spite of repeated requests and suggestions made by Rabbi Lefkowitz, you have responded with the "letter of the law" and nothing more.....

We fail to understand why a 55+ community cannot demonstrate the compassion and understanding necessary to accommodate the needs of the disabled.  A community comprised of seniors and various racial, ethnic and religious backgrounds, which were and in certain circumstances still are the recipients of discrimination, should display a demonstrative sensitivity to the America of today.  No longer a "melting pot" in which our differences are cooked away resulting in the "idealized American," but rather a "tossed salad" in which the various hues, textures, aromas and tastes of our varied backgrounds are treasured, contributing toward the strength and versatility of our society, Westlake should join the chorus of those who cheer – vive la difference!

We, as well, wish comment upon your recent change of your by-laws which appears to limit the right of public assembly in one's

12

**DRAFT**

> home. We would strongly urge you to reconsider this inappropriate decision by your HOA.
>
> We believe your community of Westlake can, as a 55+ community, be the leader in bringing a reinvigorated sense of tolerance and respect to Jackson Township. We urge you to reconsider your decisions and work with Rabbi Lefkowitz, a man known for his understanding and desire to respect all citizens of our great nation, to build a more embracing and harmonious Jackson.

72.     Defendants did not respond to the Rabbis' Joint Letter.

73.     Not having heard anything from Defendants, on March 15, 2018, Rabbi Lefkowitz again wrote to the Board.

74.     In his March 15, 2018 letter, Rabbi Lefkowitz began by expressing his "sense of deep despair" that he had just discovered that Westlake had a "Disability Committee" and he and his sons – who Defendants know are disabled – had never been so informed.

75.     In his March 15, 2018 letter, Rabbi Lefkowitz again requested an accommodation to allow him to build a permanent screened porch / sukkah.

76.     Ms. Rivere responded by letter dated March 28, 2018. Notwithstanding that Rabbi Lefkowitz had been asking for an accommodation for more than a year, Ms. Rivere for the first time expressly acknowledged Rabbi Lefkowitz's request for a handicap accommodation. However, rather than granting the accommodation, she requested that Rabbi Lefkowitz apply for one and provided him with a form entitled "Request for Reasonable Accommodation."

77.     After being at times ignored and at other times summarily dismissed, Rabbi Lefkowitz was forced to retain counsel to vindicate his rights.

78.     During the months of June, July and August 2018, counsel for Rabbi Lefkowitz and counsel for Defendants exchanged various correspondence. In that correspondence, Defendants

13

**DRAFT**

did not cite any authority for the proposition that the Association's rules and regulations prohibit Rabbi Lefkowitz from constructing a screened porch that could be used as a permanent sukkah.

79.     On September 17, 2018, Rabbi Lefkowitz submitted an application for a screened porch that could also be used as a permanent sukkah.

80.     The screened porch / sukkah requested by Rabbi Lefkowitz is permitted by the Association's rules and regulations.

81.     Assuming *arguendo* that the screened porch / sukkah were not permitted by the Association's rules and regulations, Rabbi Lefkowitz would be entitled to construct the screened porch / sukkah because it is necessary to afford the Lefkowitzes full enjoyment of the premises and equal opportunity to use and enjoy their house.

**The Gate Opening on to Gale Chambers Road**

82.     In his March 15, 2018 letter to the Board, Rabbi Lefkowitz also requested that the gate in the fence that separates Westlake's property from Gale Chambers Road be unlocked and that a path be installed so that Rabbi Lefkowitz and his family could use the gate.

83.     Rabbi Lefkowitz explained that his Jewish faith does not permit him or his children to use automobiles on the Sabbath or on Holy Days.  His daughter lives just on the other side of the gate on Gale Chambers Road, and a weekly prayer meeting is held every Sabbath in a home also located just on the other side of the gate.

84.     Since the gate is locked, he and his sons are forced to travel in their wheelchairs approximately 1.1 miles to his daughter's house and approximately 1.4 miles to the house where the prayer meeting is held.  Moreover, they must do so over dangerous and difficult roads that contain heavy, fast moving traffic and without sidewalks for long stretches.

14

**DRAFT**

85.    The route they are forced to traverse is from Crooked Stick Road to Bay Hill Road,

then out of Westlake and onto South Crook Bridge Road and then right on Gale Chambers Road.

86.    South Crook Bridge Road contains heavy traffic, including large commercial

vehicles, travelling at high rates of speed, with poor visibility and large of parts of which do not

have a sidewalk, forcing Rabbi Lefkowitz and his sons to operate their wheelchairs in the shoulder

of the road often at night.

87.    Because of the danger, Rabbi Lefkowitz has ceased attending the prayer service.

~~As summed up by Rabbi Lefkowitz in~~In his letter to the Board, Rabbi Lefkowitz stated that

unlocking the gate and installing a concrete path~~:~~

> would allow us easy access to a weekly prayer meeting held on the
> Holy Sabbath in a home just outside this gate. As our Faith does not
> permit the use of automobiles on the Sabbath or Holy Days we must
> wheel ourselves to these prayer services.
>
> Without access to the gate we are forced to take the long way 'round,
> exiting Westlake at Bay Hill Road. This necessitates our going
> alongside a stretch of busy South Cook Bridge Road, with its
> inadequate street lighting, little sidewalk, and, at one point our even
> being forced to enter the flow of traffic. A distance we could travel
> in safety in about 5 minutes, takes 20 or more minutes depending
> upon traffic flow, which speeds by at about 45 to 50 miles per hour.
> That traffic includes many large commercial vehicles. Poor
> visibility makes it almost impossible for a driver to see us until he is
> literally upon us creating a life endangering situation. I therefore do
> not go to the prayer service.
>
> My daughter, son-in-law and six [now seven] grandsons live just
> outside the gate on Gale Chambers Road. I am retired. Faith and
> family are key to a senior's wellbeing and happiness. I am deprived
> of both in large measure because I cannot access this gate.
>
> It is important to note that with the growing Observant Jewish
> community just outside this gate, the current several prayer groups
> held in various homes are filled to the rafters. Preliminary
> discussions are already underway to build a formal Synagogue
> structure in that general area. This will necessarily mean that other
> residents of Westlake will want to utilize this path and gate to attend

15

**DRAFT**

Sabbath and Holy Day services and other events at this future facility.

88.    Rabbi Lefkowitz thus asked for the accommodation from the Board to open the already existing gate and to install a path suitable for wheelchairs.

89.    With use of the gate, Rabbi Lefkowitz would be only approximately .3 miles from his daughter's house and the prayer service, which would take less than 10 minutes to travel. Rabbi Lefkowitz also would be able to avoid the dangerous traffic on South Crook Bridge Road and would be able to enjoy his family and practice his faith.

90.    In the May 8, 2018 letter from Ms. Rivere, the Board flatly rejected Rabbi Lefkowitz's request for this accommodation. The Board did not acknowledge its obligations under the FHA or the NJLAD to provide an accommodation based on disability or religion to a handicapped person and simply claimed that the "gate in question was never intended to be a regular access point in this gated community" and that in "the Board's opinion it [is] not in the best interests of the community as a whole, and the residents whose homes are adjacent to this access gate, to create a public pedestrian entrance to the community behind that area."

91.    Rabbi Lefkowitz, through a June 25, 2018 letter from his counsel, again requested Defendants to accommodate him by installing a path and giving him a lock to the gate. Rabbi Lefkowitz also informed Defendants of their obligation to do so under the FHA, among other laws.

92.    Defendants, through counsel, responded by letter dated July 26, 2018, in which they changed their purported justification for denying the Lefkowitzes' request. Defendants stated that the site plan for the community indicates that (a) the gate is an access point for construction and other emergency vehicles, (b) that the area between the gate and Crooked Stick Road contains an easement for emergency vehicles, (c) that the location was not "intended" for "regular vehicular

16

**DRAFT**

traffic or pedestrian traffic," and (d) that the Association "does not intend" to open the emergency access to general access for the community.

93.  Rabbi Lefkowitz responded by stating that none of these assertions provide a legitimate basis for denying his request that he and his two sons be permitted to use the gate to exit the community to see his daughter and her family and attend a prayer meeting.

94.  The gate need not be opened to the public or to members of the Association generally.

95.  Allowing Rabbi Lefkowitz and his sons, all of whom are amputees, to use it will suffice to accommodate the Lefkowitzes' handicaps.

96.  The Association simply needs to provide Rabbi Lefkowitz, and only Rabbi Lefkowitz, with a Sabbath-usable key or access and construct a suitable path for him and his sons to traverse in their wheelchairs.  This will prevent the gate from being a general access point.

97.  The assertion that the gate is intended only for use as an access point for emergency and construction vehicles, and the implication that Rabbi Lefkowitz's use of the gate a few times a week will somehow interfere with that use, is belied by the actual nature of the gate.  It is a very narrow gate that does not appear wide enough to accommodate emergency or construction vehicles.

98.  There is no apparent reason why an emergency or construction vehicle would need to use this locked gate and travel over a grassy area rather than coming through the main gate or the nearby gate located at the intersection of Bay Hill Road and S. Crooks Bridge Road.

99.  The use of the gate by Rabbi Lefkowitz and his sons would not interfere with the use of gate by emergency vehicles.

**DRAFT**

100.    In the letter, Rabbi Lefkowitz also noted that he and his sons need a suitable path for their wheelchairs from the sidewalk on Crooked Stick Road through the gate.  That location currently is a grass covered lot.  Rabbi Lefkowitz proposed that the path could be constructed using any of a variety of grass walkway systems that are available.  With these systems, a path could be constructed that would support the wheelchairs while allowing grass to grow over the path so that the location would continue to look simply like a grass covered lot.

101.    Subsequently, Rabbi Lefkowitz provided Defendants with information indicating that the approximate total cost the installation of the path would be between $3,675.00 and $5,145.00, plus the cost of installing a Sabbath-accessible gate that Rabbi Lefkowitz could operate.

102.    On August 30, 2018, Defendants' counsel responded by saying that the "Association is thus far not persuaded that this particular form of accommodation is required by the federal Fair Housing Act."

103.    On September 20, 2018, Rabbi Lefkowitz and his son Levi met with members of the Board.  Counsel for both parties were also present.

104.    At that meeting, Defendants again rejected the Lefkowitzes' request that they be permitted to use the gate to Gale Chambers Road.

105.    Defendants proffered their third different purported justification for denying the Lefkowitzes' request.  Now they claimed that the use of the gate by the Lefkowitzes would "change the character of the community."

106.    To date, Defendants have refused to comply with their obligations under the FHA, NJLAD and the Association's governing documents and have not accommodated the Lefkowitzes with respect to either the screened porch / sukkah or the gate to Gale Chambers Road.

DRAFT

## COUNT I
### (FAIR HOUSING ACT – 42 U.S.C. § 3604)

107.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

108.    Section 3604(f) of the FHA makes is unlawful to discriminate in the sale or rental or to otherwise make unavailable or deny or to discriminate against any person in the terms, conditions or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling because of the handicap of that person, any residing in or intending to reside in a dwelling, or any person associated with that person. 42 U.S.C. § 3604(f)(1) & (2).

109.    The FHA defines discrimination to include (a) a refusal to permit reasonable modifications of existing premises occupied by such persons if such modifications may be necessary to afford such person full enjoyment of the premises; and (b) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such persons equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604 (f)(3)(A) & (B).

110.    The Lefkowitzes are all handicapped within the meaning the FHA.

111.    Defendants have violated the FHA by refusing and continuing to refuse to reasonably accommodate the Lefkowitzes' handicaps by refusing to permit the Lefkowitzes to construct the screened porch / sukkah they requested and refusing to allow the Lefkowitzes to use the gate on to Gale Chambers Road and to install a path to the gate.

112.    The Lefkowitzes have been damaged and continue to be damaged by Defendants' refusal to reasonably accommodate their handicaps.

19

<u>**DRAFT**</u>

<u>**COUNT II**</u>
**(FAIR HOUSING ACT – 42 U.S.C. § 3617)**

113.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

114.   Section 3617 of the FHA provides that "[i]t shall be unlawful to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title." 42 U.S.C. § 3617.

115.   The Lefkowitzes have exercised their right to seek accommodations for their handicaps so that they can fully and freely exercise their religion.

116.   By, among other things, delaying for many months to respond to the Lefkowitzes' request regarding a screened porch / sukkah, providing false bases for denying those requests, refusing to grant the Lefkowitzes the accommodations they requested regarding to a screened porch / sukkah and the gate to Gale Chambers Road, and by doing all of the foregoing because of the Lefkowitzes' religion, Defendants interfered with the Lefkowitzes' rights under the FHA.

117.   The Lefkowitzes have been damaged and continue to be damaged by Defendants' unlawful interference.

117.

**Formatted:** Indent: Left:  0.5", No bullets or numbering

**DRAFT**

## COUNT III
### (NJ LAW AGAINST DISCRIMINATION)

118.  Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

119.  The NJLAD prohibits unlawful discrimination based on disability or creed.

120.  Unlawful discrimination under the NJLAD also includes refusing to make reasonable accommodations because of disability or creed for persons with disabilities.

121.  The Lefkowitzes are disabled within the meaning of the NJLAD and are Orthodox Jews.

122.  Defendants have violated the NJLAD bBy refusing and continuing to refuse to reasonably accommodate the Lefkowitzes' disabilities and creed by refusing to permit the Lefkowitzes to construct the screened porch / sukkah they requested and refusing to allow the Lefkowitzes to use the gate on to Gale Chambers Road and to install a path to the gate, Defendants have violated the NJLAD, including without limitation N.J.S.A. 10:5-4, N.J.S.A. 10:5-4.1, N.J.S.A. 10:5-12, and N.J.A.C. 13:13-3.4.

123.  Defendants have violated the NJLAD bBy refusing to grant these accommodations based on the Lefkowitzes' disabilities and creed.

123.  Defendants have violated the NJLAD, including without limitation N.J.S.A. 10:5-4, N.J.S.A. 10:5-4.1, N.J.S.A. 10:5-12, and N.J.A.C. 13:13-3.4.

124.  The Lefkowitzes have been damaged and continue to be damaged by Defendants' violations of the NJLAD.

## COUNT IV
### (BREACH OF THE ASSOCIATION'S GOVERNING DOCUMENTS)

125.  Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set

**DRAFT**

forth in this Count of the Complaint.

126.    The Association's governing documents, including without limitation the Amended and Restated Declaration of Covenants, Easements and Restrictions for Westlake Master Association, Inc., By-Laws and Rules and Regulations, permit the Lefkowitzes to construct the screened porch / permanent sukkah they have requested.

127.    Defendants have breached the governing documents by refusing to grant approval for the Lefkowitzes' screened porch / sukkah.

128.    The Lefkowitzes have been damaged and continue to be damaged by Defendants' breach of the Association's governing documents.

**COUNT V**
**(BREACH OF THE PREDFDA)**

129.    Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

130.    The PREDFDA provides that "the association shall exercise its powers and discharge its functions in a manner that protects and furthers the health, safety and general welfare of the residents of the community." N.J.S.A. 45:22A-44(b).

131.    Defendants violated this section by not granting the Lefkowitzes' requests regarding the screened porch / sukkah and gate onto Gale Chambers Road.

132.    Interfering with the Lefkowitzes' ability to practice their religion by not permitting the requested screened porch / sukkah does not protect the health, safety and general welfare of the residents of Westlake.

133.    Refusing to allow the Lefkowitzes to use the existing gate onto Gale Chambers Road, thereby forcing them to travel in their wheelchairs on a busy road that does not have sidewalks or even a shoulder for large stretches does not protect the health, safety and general

22

**DRAFT**

welfare of the residents of Westlake.

134.   The Lefkowitzes have been damaged and continue to be damaged by Defendants'

violation of the PREDFDA.

134.

> **Formatted:** Indent: Left:  0.5",  No bullets or numbering

**DRAFT**

**COUNT VI**
**(AIDING AND ABETTING VIOLATIONS OF THE FHA AND NJLAD)**

135.   Plaintiffs repeat the allegations contained in the foregoing paragraphs as if fully set forth in this Count of the Complaint.

136.   The defendant Board Members aided the Association's violations of the FHA and NJLAD and that are set forth in the foregoing paragraphs of the Complaint.

137.   The defendant Board Members knowingly and substantially assisted the Association in its violations of the FHA and NJLAD with the awareness that Defendants were violating the FHA and NJLAD.

138.   The Lefkowitzes have been damaged and continue to be damaged by the Board Members' aiding and abetting the Association in its violations of the FHA and NJLAD.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs respectfully request the following relief:

a.   A Judgment that Defendants have violated the FHA and the NJLAD, and/or that the Board Members have aided and abetted such violations, and that Defendants have breached the Association's governing documents and the PREDFDA;

b.   An Order directing Defendants (a) to approve the Lefkowitzes' screened porch / sukkah; and (b) to construct a path between the sidewalk on Crooked Stick Road and the gate that opens onto Gale Chambers Road and equip the gate with a Sabbath-accessible lock satisfactory to the Lefkowitzes (meaning a lock that does not use electronic devices) or to leave the gate unlocked from two hours before sunset on Fridays to one hour after sunset on Saturday and for similar times on holy days;

c.   An award of compensatory damages;

24

**DRAFT**

d.  An award of punitive damages;

e.  An award of attorneys' fees and costs as permitted by law, including under the FHA and NJLAD; and

f.  such other and further relief as the Court deems necessary and just under the circumstances.

**DRAFT**

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial

on all issues so triable.

Dated: ~~October 11, 2018~~April ___, 2019            BEVELOCK & FISHER LLC
                                                      *Attorneys for Plaintiffs*

                                                      By:~~/s Gregory J. Bevelock~~
                                                      Gregory J. Bevelock
                                                      Charles M. Fisher
                                                      BEVELOCK & FISHER LLC
                                                      14 Main Street, Suite 200
                                                      Madison, NJ 07940
                                                      (973) 845-2999
                                                      gbevelock@bevelocklaw.com
                                                      cfisher@bevelocklaw.com


**LOCAL CIVIL RULE 11.2 CERTIFICATION**

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is not

related to any other pending matter.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on ~~October 11, 2018~~April ___, 2019
Madison, New Jersey

                                        */s Gregory J. Bevelock*
                                        Gregory J. Bevelock

26